IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MARY A. MURPHY                    *
                                  *    CIVIL NO. SKG-08-870
     v.                           *
                                  *
MICHAEL ASTRUE,                   *
COMMISSIONER OF SOCIAL SECURITY   *

*     *     *     *     *     *     *     *     *     *     *     *     *

<u>MEMORANDUM OPINION</u>

The plaintiff, Mary Murphy, by her attorney, John A. Schruefer, Jr., of Seidel, Tully & Ferrer, filed this action seeking judicial review, pursuant to 42 U.S.C. § 405(g), of the final decision of the Commissioner of the Social Security Administration ("the Commissioner"), who denied her claim for Supplemental Security Income benefits ("SSI") under Title XVI of the Social Security Act ("the Act"). This case has been referred to the undersigned magistrate judge by consent of the parties pursuant to 28 U.S.C. § 636(c) and Local Rule 301.

Currently pending before the Court are cross motions for summary judgment. (Paper Nos. 14 and 20). No hearing is necessary. Local Rule 105.6. For the reasons more fully set forth below, this Court VACATES the decision of the Commissioner, DENIES plaintiff's motion for summary judgment and DENIES defendant's motion for summary judgment and REMANDS for further consideration in light of this opinion.

1

## Procedural History

Plaintiff filed an Application for SSI on September 23, 2005, alleging an inability to work commencing on March 1, 2003. At the time of the hearing before the Administrative Law Judge ("ALJ") on May 25, 2007, the date of her alleged onset was amended to September 23, 2005, the date of the filing of the application. (R. at 360). The plaintiff alleged that mental illness, a crushed leg, and asthma rendered her unable to work. (R. at 72). The plaintiff's application for SSI payments was initially denied on February 1, 2006, and was denied again upon reconsideration on July 10, 2006. (R. at 38, 34).

The plaintiff filed a motion for a hearing before the ALJ and a hearing was held on May 25, 2007 before ALJ Michael J. Cummings. (R. at 358-363). A written decision, dated June 29, 2007 found that the plaintiff was not eligible for SSI payments. (R. at 13-21). The plaintiff filed a Request for Review of the ALJ's decision with the Social Security Appeals Council ("SAC") on July 16, 2007. (R. at 9). On February 27, 2008, the SAC denied the plaintiff's request for review and the decision of the ALJ became the final decision of the Commissioner. (R. at 5-8). The plaintiff filed this instant action on September 30, 2008. (Paper No. 14).

## Factual Background

**Medical Evidence**

**Dr. McGinnis**

On March 28, 2003, the plaintiff was admitted to the Peninsula Regional Medical Center in Salisbury, Maryland after being pushed from a moving vehicle. (R. at 183). The plaintiff suffered an open Lisfranc dislocation[1] of the right foot with a fifth toe metatarsal phalangeal joint dislocation.[2] Id. At that time, Dr. Edward McGinnis performed an irrigation debridement,[3] open reduction[4] and internal fixation[5] with K-Wire Lisfranc fracture dislocation of the right foot and a closed reduction[6] of the fifth metatarsal joint. (R. at 185). He also prescribed a 24 hour period of post-op of intravenous antibiotics. (R. at 186). On April 8, 2003, Dr. McGinnis changed the plaintiff's cast and removed her sutures. (R. at 210). At this time, Dr. McGinnis also explained the importance of keeping weight off of the injury and noted that the plaintiff's prognosis was good. Id. On April 30, 2003, Dr. McGinnis noted that despite his

---

[1] A dislocation of joints within the foot named after French surgeon, James Lisfranc. AnneMarie W. Block, et al., Dorland's Illustrated Medical Dictionary, 1080 (2007).

[2] A dislocation of the joints connecting the bones in toes. Id. at 1162.

[3] The removal of devitalized or contaminated tissue using water. Id. at 481.

[4] The correction of a fracture after incision into the site. Id. at 1633.

[5] The stabilization of fractured bones by direct fixation to one another with surgical wires. Id. at 721.

[6] The correction of a fracture without incision. Id. at 1633.

warnings, the plaintiff had been walking on her cast.  (R. at
209).  On May 13, 3003, Dr. McGinnis noted that the "open
fracture area had healed completely."  (R. at 209).  The hardware
in the plaintiff's right foot was removed by surgical procedure
on May 21, 2003.  (R. at 196).  The plaintiff did not attend
scheduled appointments with Dr. McGinnis on July 2, 2003, July 9,
2003, and August 9, 2004.  (R. at 207-208).

**Eastern Shore Podiatry**

On December 8, 2005, a treating source medical report was
completed by Eastern Shore Podiatry dealing with the plaintiff's
right foot.  (R. at 214).  Severe pain in the plaintiff's right
foot was noted as a result of the motor vehicle accident with
crush injury.  Id.  At this time, the plaintiff said she was
having pain after resting and with prolonged standing.  Id.
Examination results noted that the plaintiff had a collapsing
PesPlanus,[7] along with hallux valgus[8] on the right, pain at the
peroneal tendons, dorsal exostosis[9] at the second unit-curciform
joint with pain from joints two through four at the cruciform
joints.  Id.  An x-ray revealed signs of surgical intervention,

---

[7]A condition causing flattening of the foot. Id. at 1441.

[8]Angulation of the great toe away from the midline of the
body. Id. at 829.

[9]A benign bone growth located at the back of the joint. Id.
at 668.

dorsal exostosis at the second MCJ with subluxed[10] intermediate cruciform and mid-foot degenerative changes.  (R. at 215).  The plaintiff's diagnosis at this time was (1) post traumatic arthropathy[11] on the right; (2) tenosynovitis,[12] peroneal tendons; (3) pes Valgo Planus on the right.  Id.  The treatment was to inject the peroneals, x-ray and strap the foot.  Id.

**Dr. Barrish**

At the request of Maryland Disability Determination Services, on January 18, 2006 Dr. William Barrish, M.D. performed a consultative examination of Ms. Murphy, during which he noted that the plaintiff used a walking boot, but no other assistive device, and that she would likely need fusion of her ankle in the future.  (R. at 233-235).  Dr. Barrish opined that the plaintiff had likely developed post traumatic arthritis and noted that the plaintiff's asthma symptoms appeared to be well controlled.  (R. at 233).  Dr. Barrish also noted the plaintiff's psychiatric history including bipolar disorder, attention deficit disorder and prior drug use.  Id.  Dr. Barrish felt that the plaintiff could sit for eight hours per day but could stand or walk for less than one hour per day.  (R. at 234).  No limitations

---

[10]Partially dislocated. Id. at 1817.

[11]Joint disease. Id. at 160.

[12]Inflammation of a tendon sheath. Id. at 1905.

regarding bending, crawling, crouching, and stooping were noted.
(R. at 235).

**DDS Physicians**

A non-examining DDS physician performed a Physical Residual
Functional Capacity Assessment ("RFC") on the plaintiff on
January 31, 2006.  (R. at 301-307).  This RFC was affirmed by a
second non-examining DDS physician on June 22, 2006.  (R. at
307).  The results of the RFC were that the plaintiff could
occasionally lift fifty pounds, frequently lift twenty five
pounds, and stand or walk for a total of approximately six hours
in an eight hour work day.  (R. at 302).  The RFC also showed
that the plaintiff could sit with normal breaks for about six
hours in an eight hour work day.  Id.  The results also showed
that the plaintiff could occasionally balance and climb ramps,
stairs, ladders, ropes and scaffolds.  (R. at 303).  Both the
non-examining physician and the physician affirming the RFC from
January 31, 2006, agreed that the plaintiff's asthma did not
result in environmental limitations.  (R. at 305, 308-309).

**Atlantic Health Center**

On August 29, 2005, Dr. Arzadon from Atlantic Health Center
in Berlin, Maryland completed a medical report for the Department
of Social Services.  (R. at 298).  Dr. Arzadon's diagnosis was
arthrosis of the right foot, ADHD, bipolar disorder, asthma, and
substance abuse history although no indication of substance abuse

6

had been apparent for five months. <u>Id.</u> In this report, it is noted that the plaintiff has no restrictions on sitting, but has a two hour restriction on standing and should not walk, climb, carry, or squat. (R. at 299). The plaintiff also has a two hour restriction on bending and no restrictions on reaching or crawling. <u>Id.</u> The report states that the heaviest weight the plaintiff can lift is twenty pounds and that she could lift ten pounds frequently. <u>Id.</u> Dr. Arzadon notes that the plaintiff should never be exposed to extreme cold, chemicals, dust, fumes or odor and can be exposed to heights on an occasional basis. <u>Id.</u> The plaintiff can frequently be exposed to extreme heat, humidity and noise. <u>Id.</u> The report further notes that cold causes the plaintiff's foot to ache and chemical dust, fumes, and odor affect her asthma. <u>Id.</u> No restrictions on daily living were noted. (R. at 300). However, mild restrictions in maintaining social functioning, frequent difficulties in maintaining concentration of persistence of pace, and continual repeated episodes of decompression, each of extended duration, were noted. <u>Id.</u> Dr. Arzadon also noted that the plaintiff had chosen to stop working as a result of her medical conditions. <u>Id.</u>

A treating source medical report from January 3, 2006 completed by Atlantic Health Center diagnosed the plaintiff as having a right foot arthritosis, bipolar disorder, ADHD and asthma or reactive airway disease. (R. at 296). This report

also noted that the plaintiff had an old fractured left ulna, clavicle osteophytes,[13] degenerative joint disease, and extensive deformity of the tarsal bones from the old fracture.  (R. at 297).

**Worchester County Health Department**

A pharmacological management assessment was performed on the plaintiff on June 21, 2005.  (R. at 286).  The assessment notes that the plaintiff is a forty-one year old individual with impulsivity, poor concentration, distractibility, and hyperactivity.  (R. at 284).  The plaintiff appeared well-groomed and her personal hygiene appeared to be good.  Id.  The report indicated that the plaintiff suffered from stress, had a moderately abnormal mood and was restless.  Id.  Her sleep disturbance was rated as intermittent.  Id.  The plaintiff's speech was loud and she was observed as having an inability to concentrate, a decrease in daily activities, poor impulse control and problems with judgment.  (R. at 285).

A second pharmacological management assessment completed on June 24, 2005 indicated that the plaintiff was anxious, and was not currently stressed or suffering from a mood impairment.  (R. at 281).  The plaintiff continued to be restless at this time, but had no sleep disturbance.  Id.  She also noted a decreased appetite but no thought disturbance.  (R. at 282).  She still had

---

[13]A growth on the collar bone.  Id. at 1369.

8

inability to concentrate, a decrease in daily activities and poor impulse control.  Id.  However, she no longer had problems with judgment or memory.  Id.

On June 30, 2005, a third pharmacological management assessment was performed on the plaintiff.  (R. at 278).  The assessment indicated that the her behavior and psycho motor assessment normal.  (R. at 276).  The plaintiff continued to have a decreased appetite but was improving on the medication she had been given.  (R. at 276-277).

A diagnostic review form completed July 19, 2005 indicates that the plaintiff denied feeling depressed but reported having issues related to her childhood and parents.  (R. at 273).  The plaintiff had one reported attempted suicide about ten years before, but reported that she had not had any suicidal or homicidal ideations or plans since then.  Id.  The plaintiff's family history contains significant depression and addiction issues.  Id.  The plaintiff reported that she had been using crack cocaine since the age of thirty-three.  Id.  At the time of the review she was forty-one years old.  Id.  The plaintiff reported that she used crack cocaine in binges and said that she had last used crack on April 14, 2005, prior to going to jail for eight weeks.  Id.  She also reported drinking alcohol since age fifteen, but only occasionally, always resulting in intoxication. Id.  The plaintiff voluntarily submitted to addiction treatment. Id.  She reported that her racing mind and sleep disorder had

improved since adhering to sobriety and beginning prescribed medication.  Id.  The plaintiff was diagnosed on Axis-I with attention deficit hyperactivity disorder ("ADHD"), depressive disorder, cocaine dependence and alcohol dependence.  Id.

A fourth pharmacological management assessment from July 19, 2005 showed continued improvement as far as the plaintiff's ability to concentrate.  (R. at 268).  At this time, the plaintiff did continue to complain of decreased appetite and intermittent disturbances with sleep.  (R. at 269).

Another pharmacological management assessment was performed on the plaintiff on August 9, 2005.  (R. at 267).  This assessment showed improvement in the plaintiff's appetite, but a slightly abnormal mood and restless psychomotor activity.  (R. at 264).  On August 18, 2005, another pharmacological assessment note indicated that the plaintiff's medication level had changed and that her condition was improving.  (R. at 258).  This assessment showed appropriate behavior and no mood impairment. (R. at 258-259).  At that time, the plaintiff reported no disturbances with her sleep and her speech was appropriate but loud.  (R. at 259).  The plaintiff had an increased appetite and significant weight gain.  (R. at 258-259).  She was not experiencing thought disturbances at this time.  (R. at 259).

The plaintiff's final pharmacological assessment was performed on September 22, 2005.  (R. at 252).  The assessment showed her behavior was anxious and her psychomotor level was

restless.  (R. at 252-253).  She also complained of intermittent
disturbances in sleep and an increase in appetite.  (R. at 253).
Aside from these complaints, the plaintiff had an otherwise
normal assessment.  She was taking Lithium and Concerta.  (R. at
254).

**Dr. Dimitrova**

Dr. Gergana Dimitrova saw the plaintiff on October 3, 2005.
(R. at 248).  In that psychiatric note, it was reported that the
plaintiff was minimally anxious, moderately distracted, and
minimally impulsive.  Id.  She had moderate racing thoughts and
was moderately stressed.  Id.  The plaintiff's mood was
appropriate, her psychomotor status restless and her speech
rapid.  (R. at 249).  She continued to have intermittent sleep
disturbances but no appetite disturbances.  Id.  At that time,
she was taking Concerta, Lithium and Topomax for her
psychological issues.  (R. at 248).  The plaintiff's Axis-I
diagnosis remained the same.  (R. at 250-251).

A second note from Dr. Dimitrova was completed on November
8, 2005.  (R. at 244).  This note indicated that the plaintiff's
mental status was normal except for minimal and distractible
occurrences of anxiousness, impulsiveness, irritability, and
manic.  Id.  Dr. Dimitrova also indicated the presence of
moderate racing thoughts and stress.  Id.  The plaintiff's
psychomotor level was rated as restless and she was sleeping four

11

to six hours a night.  (R. at 245).  She had not been
experiencing appetite disturbances.  Id.

Dr. Dimitrova's psychiatric note of February 18, 2006
indicated that the plaintiff was moderately anxious,
distractible, stressed, minimally impulsive, irritable and manic.
(R. at 239).  Dr. Dimitrova noted increased energy disturbances
in the plaintiff.  (R. at 240).  The plaintiff's medications at
this time were the psychiatric medications of Burspar, Lithium
Carbonate, Topomax and Trazodone.  (R. at 241).

On October 5, 2006, Dr. Dimitrova wrote another psychiatric
note on the plaintiff, noting that she showed minimal
anxiousness, impulsiveness, moderate stress, and no
distractibility, irritability, manic or racing thoughts.  (R. at
334).  The plaintiff's speech, psychomotor level, and affect were
all rated as appropriate at that time.  (R. at 335).  She was
still experiencing intermittent sleep disturbances and sleeping
from four to eight hours a night.  Id.  The plaintiff was not
experiencing appetite disturbances at this time.  Id.  She also
had increased energy disturbance and normal orientation.  Id.

A note from Dr. Dimitrova dated December 6, 2006 showed
minimal anxiousness and moderate stress.  (R. at 329).  All other
parts of the mental status exam were normal.  Id.  At this time,
the plaintiff's psychomotor level and affect were each
appropriate.  (R. at 330).  Her appetite and orientation were
normal.  Id.  Her speech was rapid and her sleep disturbance was

noted as being intermittent.  Id.  The plaintiff was still
sleeping from four to six hours in an eight hour period.  Id.
The plaintiff's Axis-I diagnosis remained the same.  (R. at 331-
332).

Dr. Dimitrova's final note regarding the plaintiff, dated
March 14, 2007, showed minimal anxiousness, impulsiveness and
moderate stress.  (R. at 324).  At the time of that report, the
plaintiff's affect was appropriate to mood and her psychomotor
level was also appropriate.  (R. at 325).  The plaintiff's speech
was rapid and her sleep patterns remained the same.  Id.  She did
not report experiencing appetite disturbances and her energy
disturbance had increased.  Id.  At the time of the report, her
Axis-I diagnosis remained the same.  (R. at 326).  At each of the
plaintiff's assessments by Dr. Dimitrova, her Global Assessment
of Functioning ("GAF") score was assessed as fifty.  (R. at 327).

Dr. Dimitrova completed a "Mental Residual Functional
Capacity Questionnaire" on June 4, 2007.  (R. at 344).  Contrary
to her treating records, Dr. Dimitrova opined that Ms. Murphy's
GAF score was 45 and that her highest GAF score in the past year
was 45. (R. at 340).  Symptomatically, Dr. Dimitrova supported
the score with her findings of impaired impulse control, mood
disturbance, difficulty thinking or concentrating, psychomotor
agitation or retardation, persistent disturbances of mood or
affect, emotional withdraw or isolation, bipolar syndrome with a
history of episodic periods, manifested by the full symptomatic

13

picture of both manic and depressive syndromes, hyperactivity, motor tension, flight of ideas, manic syndrome, pressures of speech, easy distractibility, sleep disturbance and decreased need for sleep.  (R. at 341).

Dr. Dimitrova opined that the plaintiff's mental abilities and aptitudes needed to do unskilled work were limited but satisfactory in the areas of understanding and remembering very short and simple instructions, carrying out very short and simple instructions and asking simple questions or requesting assistance.  (R. at 342).  Her mental abilities and aptitudes were assessed as being seriously limited, but not precluded in the areas of remembering work-like instructions and making simple work related decisions.  (R. at 343).  Her mental abilities and aptitudes for unskilled work were unable to meet competitive demands in areas such as maintaining attention for a two hour segment, maintaining regular attendance and being punctual within customary and usually strict tolerances, sustaining an ordinary routine without special supervision, and working in coordination with or proximity to others without being unduly distracted.  Id. Dr. Dimitrova opined that the plaintiff was able to complete a normal weekday or work week without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, accept instructions and respond appropriately to criticism from supervisors, get along with co-workers or peers without unduly

distracting them or exhibiting behavioral extremes, respond
appropriately to changes in a routine work setting, deal with
normal work stress and be aware of normal hazards and take
appropriate precautions.  (R. at 342).  Additionally, the
plaintiff was unable to meet competitive standards in the areas
of understanding and remembering detailed instructions, setting
goals or making plans independently of others and dealing with
the stress of semi-skilled and skilled work.  (R. at 343).  The
plaintiff's mental abilities and aptitudes seriously affected,
but did not preclude her from adhering to basic standards of
neatness and cleanliness or using public transportation.  Id.
She was also unable to meet competitive standards in the areas of
acting appropriately with the general public, maintaining
socially appropriate behavior and traveling in unfamiliar places.
Id.  The doctor notes that the plaintiff suffers from severe
bipolar disorder, Type I with manic and depressive episodes.  Id.
Further noted is that the plaintiff has significant rage
episodes, irritability and impulsivity, and that her depression
and irritability exacerbate the plaintiff's experiences of pain
or other physical symptoms.  Id.

**Dr. Caroline Moore**

Caroline B. Moore, Psy.D., completed a Mental Residual
Functional Capacity assessment on December 12, 2005.  (R. at
313).  Dr. Moore opined that Ms. Murphey had "no social
restrictions, mixed attention and concentration at times, and

moderate impairments in continuity of performance and adaption."
(R. at 314).  She was found "not significantly limited" in all
categories, but two where she was found to be "moderately"
limited.  (R. 313).  Dr. Moore concluded that Ms. Murphy retained
"the functional capacity to perform work-related tasks from a
mental standpoint on an ongoing basis."  Dr. Moore's findings
were reviewed and affirmed on June 27, 2006.  <u>Id</u>.

**Dr. William Hakkarinen**

Disability Determination Services ("DDS") physician William
D. Hakkarinen M.D. completed a Physical Residual Functional
Capacity Assessment on June 22, 2006.  (R. at 301-308).  Dr.
Hakkarinen opined that Ms. Murphy could lift fifty pounds
occasionally and twenty-five pounds frequently.  (R. at 302).  He
further stated that she could stand or walk for about six hours
and sit for about six hours in an eight hour workday.  <u>Id</u>.

**Plaintiff's Adult Functioning Report**

The plaintiff completed an Adult Functioning Report on
October 26, 2005 where she indicated that her daily activities
consist of getting up, getting dressed, and going to her
Alcoholics Anonymous meetings or mental health appointments.  (R.
at 81-88).  The plaintiff indicated that before she became ill
she could work all day on her feet.  (R. at 82).  She indicated
that when she takes a bath she has no problems, but if she takes
a shower she has to hold on to something because she can not put

16

pressure on her right foot.  Id.  The plaintiff sometimes prepares her own meals, but is limited when doing house and yard work.  (R. at 83).  She is able to go out alone and she travels by walking or driving a car.  (R. at 84).  She is also able to shop and pay bills, count change, handle a savings account, and use a check book or money orders.  Id.  The plaintiff indicates that she is outgoing and loves meeting new people and watching television, but is limited to how long she can stay on her feet, ride a bicycle or similar activities because of the pain in her foot.  (R. at 85).  She attends church and visits her mother on a regular basis.  Id.  She does not need to be reminded to go places or need anyone to accompany her.  Id.  The plaintiff indicated that she has no problems getting along with family, friends or neighbors, but does have problems lifting, squatting, bending, standing for a long time, walking for a long time, kneeling and a small problem climbing stairs.  (R. at 86).  She also finds it difficult to finish what she starts because of her ADHD.  Id.  While the plaintiff gets along with authority figures, she has been laid off of jobs because of problems getting along with people.  Id.  Additionally, the plaintiff noted that she does not handle stress very well.  (R. at 87).  She has worked as a waitress and a cashier.  (R. at 89).

**Hearing Testimony**

The plaintiff testified at the hearing before an Administrative Law Judge held on May 25, 2007.  (R. at 358).  She

17

was represented by her attorney, Mr. David Furrer.  Id.  The
plaintiff testified that her last job was as a waitress and that
she had stopped working due to her foot injury.  (R. at 359).
She also testified that she was diagnosed with bipolar disorder a
couple of years ago and has been under treatment since then.  (R.
at 359-360).  Her treating psychiatrist is Dr. Dimitrova.  The
plaintiff indicated that she has had a variety of jobs which she
lost.  (R. at 360).  She testified that she loses jobs because
she is unable to control her bipolar swings.  (R. at 361).  The
plaintiff said that some days she would go to work and be very
depressed and other days she would be crazy or manic.  Id.  This
condition affected her ability to relate to co-workers and
customers and to do her job.  Id.  The plaintiff's attorney
requested and was granted permission to procure a Psychiatric
Functional Capacity Assessment from her treating physician.  (R.
at 362).  The ALJ requested that the assessment be submitted
within two weeks.  Id.  This assessment was provided on June 5,
2007 - that of Dr. Dimitrova dated June 4, 2007.  (R. at 339).

### ALJ decision

In evaluating plaintiff's claim for disability, the ALJ
followed the five step sequential process set forth in the Code
of Federal Regulations.  20 C.F.R. § 404.1520 (2009).  Applying
this test, the ALJ concluded that plaintiff was not disabled as
defined in the Act. (R. at 10).  The Act defines a disability as
"the inability to engage in any substantial gainful activity by

reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 416(i)(1) (2001). If the agency can make a disability determination at any point in the sequential analysis, it does not review the claim further. 20 C.F.R. § 1520(a)(2009).

The first step of the process requires that the plaintiff show he or she has not been involved in substantial gainful work activity for the period of alleged disability. 20 C.F.R. §§ 404.1510, 404.1571 et seq., 416.971 et seq (2009). Substantial gainful work activity is defined by the code as work that involves significant physical or mental activities that is usually done for pay or profit. 20 C.F.R. § 416.972(b) (2009). The ALJ observed that the plaintiff had not engaged in any substantial gainful activity at any time since her alleged onset date. (R. at 15). Since the agency's observation was in the negative, the inquiry proceeds to step two.

The second step requires that the physical and mental impairments of the claimant be considered severally and in combination. 20 C.F.R. § 404.1520. The claimant's impairments must meet the durational requirements in statutes §404.1509 and 416.909, and be severe according to statutes §404.1520(c) and 416.920(c.) 20 C.F.R. §§ 404.1509, 416.909, 404.1520(c), 416.920(c) (2009). An impairment or combination of impairments

19

will be found to be severe if it significantly limits the
individual's physical or mental ability to do basic work
activities.  20 C.F.R. § 404.1520 (2009).  If a severe impairment
is found, all component impairments must be considered in the
remaining steps of the sequential analysis.  20 C.F.R. § 404.1523
(2009).  At step two, the ALJ determined that the plaintiff has a
severe impairment or combination of impairments within the
meaning of the regulations.  (R. at 16).  The ALJ considered her
bipolar disorder and crushed foot when determining that the
plaintiff had a severe combination of impairments.  (R. at 16).

At step three, the claimant's impairment or combination of
impairments must meet or medically equal the criteria of
impairment in the Listing of Impairments.  20 C.F.R. §§
416.920(d), 416.925, 416.926 (2009).  If the claimant's
impairment or combination of impairments meets the criteria of a
listing and meets the duration requirement, the claimant will be
found to be disabled without consideration of age, education or
work experience.  20 C.F.R. § 416.909 (2009).  If it does not,
the analysis proceeds to the fourth step.  Here, the ALJ
determined that the plaintiff did not have an impairment or
combination of impairments that meets or medically equals one of
the listed impairments in Appendix 1, Subpart P, 20 C.F.R. §§
416.920(d), 416.925, 416.926.  (R. at 16).

Before considering the fourth step, the ALJ must determine
the claimant's residual functional capacity.  20 C.F.R. §

416.920(e) (2009).  An individual's residual functional capacity
is her ability to do physical and mental work activities on a
sustained basis despite limitations from her impairments.  When
making this finding, the ALJ must consider all of the claimant's
impairments, including those impairments that are not severe.  20
C.F.R. §§ 416.920(e), 416.945.  Here, after consideration of the
plaintiff's entire record, the ALJ determined that the claimant
has the residual functional capacity to lift and carry ten pounds
frequently and twenty pounds occasionally.  She can stand and
walk for as long as two hours, sit for six hours, and push or
pull with her upper extremities.  (R. at 17).

      In the fourth step, the ALJ must determine whether the
claimant has the residual functional capacity to perform the
requirements of his or her past relevant work.  20 C.F.R.
§416.920(f) (2009).  The term "past relevant work" refers to work
performed, either as the claimant actually performed it or as it
is generally performed in the national economy, within the last
fifteen years or fifteen years prior to the date that disability
began.  This step requires consideration of whether the claimant
retains the residual functional capacity to perform past relevant
work.  An answer in the positive would mean that the claimant is
not disabled. 20 C.F.R. §§ 404.1520(e), 416.920(e) (2009).  If
the claimant is unable to do any past relevant work or does not
have any past relevant work, the analysis proceeds to the fifth,
and final, step.  The ALJ determined that the plaintiff has no

past relevant work.  The ALJ based this finding on the fact that the plaintiff had never held one of her former jobs, which consisted primarily of waitressing positions, for long enough to achieve substantial gainful activity.  Additionally, the ALJ found that these positions required at least light exertion, which her restriction to sedentary work would prevent her from performing.  (R. at 20).

At step five, the ALJ must determine whether the claimant is able to perform her past relevant work or perform any other work considering her residual functioning capacity, age, education, and work experience.  20 C.F.R. §416.920(g) (2009).  If the claimant is able to perform other work, he or she is not disabled.  If the claimant is not able to do other work and meets the duration requirement, he or she is disabled.  At this time, the burden of proof shifts to the agency to establish that the claimant retains the residual functional capacity to engage in an alternate job existing in the national economy.  McLain v. Schweiker, 715 F.2d 866, 868-869 (4th Cir. 1983); Wilson v. Califano, 617 F.2d 1050, 1053 (4th Cir. 1980).  The agency is responsible for proving the existence of jobs and the claimant's capacity to complete the work.  Grant v. Schweiker, 699 F.2d 189, 191 (4th Cir. 1983).  The agency must further show that the claimant possesses skills that are transferable to those alternative positions or that no such skills are necessary. McLain, 715 F.2d at 869.

The ALJ then considered the plaintiff's residual functional capacity, age, education, and work experience.  The ALJ found that the plaintiff was forty-three years old at the time the application was filed, allowing her to be defined as "a younger individual age 18-44".  The plaintiff has an 11th grade education and is able to communicate in English.  (R. at 20).  The ALJ noted that transferability of job skills is not an issue because the plaintiff does not have past relevant work, as noted above. 20 C.F.R. § 416.968.  Given these considerations, the ALJ determined that there are jobs that exist in significant numbers in the national economy that the claimant can perform.  20 C.F.R. §§ 416.960(c), 416.966 (2009).  This finding was based on consideration of all the plaintiff's impairments and a residual functional capacity for the full range of sedentary work.  (R. at 21).  The ALJ based this finding on Dr. Barrish's opinion that the plaintiff was capable of standing and walking for approximately an hour a day without the assistance of over-the-counter or prescription analgesics for pain.  (R. at 19).  Dr. Barrish noted that the plaintiff was taking Prilosec, Topamax, Burspar, Lithium, Advair, Trazodone, Spiriva, and Albuterol.  (R. at 234).  The ALJ found simple routine tasks to be appropriate for the plaintiff based on her lack of comprehension and limited attention span as documented by Dr. Dimitrova.  (R. at 20).  Due to the fact that the plaintiff could stand or walk for one hour without using pain medication, the ALJ concluded that expanding

23

her RFC to standing or walking for an additional hour would not
be unreasonable.  (R. at 19).

In making these determinations, the ALJ gave great weight to
Dr. Caroline Moore, a psychologist, who assessed the plaintiff's
mental health impairments.  (R. at 17).  Dr. Moore found that the
plaintiff was capable of completing simple work-related tasks on
an ongoing basis.  (R. at 315).  He also gave great weight to Dr.
William Barrish, who examined the plaintiff in physical
consultative examinations at the request of Disability
Determination Services.  (R. at 19).  Dr. Barrish opined that the
plaintiff could sit for eight hours per day but could stand or
walk for less than one hour per day.  (R. at 235).  The ALJ did
not give significant weight to the findings of the claimant's
treating psychiatrist, Dr. Dimitrova.  The ALJ noted that Dr.
Dimitrova's records of the plaintiff's treatment did not support
the doctor's finding of extreme limitations.  (R. at 20).  Dr.
Dimitrova's records document the plaintiff's continued
improvement from extreme symptoms which were demonstrated in the
past, including anxiety, racing thoughts, distractibility,
impulsivity, and sleeplessness.  Id.  Thus, after completing the
five step evaluation process, the ALJ determined that the
plaintiff was not disabled and was therefore ineligible for
benefits under the Social Security Act.  (R. at 21).

**Standard of Review**

The role of the Court on review is not to try the claim *de novo*, but to determine whether the Administrative Law Judge applied the correct legal standards, and whether there is substantial evidence to support the ALJ's decision.  <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990); <u>Teaque v. Califano</u>, 560 F.2d 615, 618 (4th Cir. 1977).  This Court must determine whether, upon the whole record, substantial evidence supports the Commissioner's decision.  <u>Teaque</u>, 560 F.2d 615, 618 (4th Cir. 1977); <u>Blalock v. Richardson</u>, 483 F.2d 773, 775 (4th Cir. 1972).  Substantial evidence is more than a scintilla, but less than a preponderance of the evidence.  <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971); <u>Laws v. Celebrezze</u>, 368 F.2d 640, 642 (4th Cir. 1966).  It is such that a "reasoning mind would accept as sufficient to support a particular condition." <u>Laws</u>, 368 F.2d at 642 (4th Cir. 1966); *accord* <u>Shively v. Heckler</u>, 739 F.2d 987, 989 (4th Cir. 1984).  It is evidence sufficient to justify a refusal to direct a verdict if the case were before a jury. <u>Hays</u>, 907 F.2d at 1456.

If substantial evidence supports the agency's finding of fact, than those findings are conclusive.  <u>Jolley v. Weinberger</u>, 537 F.2d 1179, 1181 (4th Cir. 1976); <u>Blalock</u>, 483 F.2d at 775.  However, "a factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law."  <u>Coffman v. Bowen</u>, 829 F.2d 514, 517 (4th Cir. 1987).  When reviewing for substantial evidence, the court will not weigh

conflicting evidence, make credibility determinations, or substitute its judgment for that of the ALJ.  Blalock, 483 F.2d at 775.  This deferential standard of review does not apply to conclusions of the law or the application of legal standards or procedural rules by the agency.  Wiggins v. Schweiker, 679 F.2d 1387 (11th Cir. 1982).  After review, the Court may affirm, modify, or reverse the decision of the ALJ with or without remanding the case for rehearing.  Melkonyan v. Sullivan, 501 U.S. 89, 98 (1991).  The court may also remand a case to the agency for consideration of new evidence upon a showing of good cause by the claimant for not having admitted that evidence earlier.  This type of remand can be made without making a substantive ruling as to the correctness of the agency's findings.

### Analysis

The plaintiff raises three arguments on appeal.  First, the plaintiff contends that the ALJ's finding that plaintiff was able "to lift and carry 10 pounds frequently and 20 pounds occasionally, stand and walk as much as two hours, sit six hours and push/pull within upper extremities" was totally contrary to findings of DDS examining physician, Dr. Barrish, and improperly reliant on non-examining medical consultants.  (R. at 17).  Second, the plaintiff contends that the ALJ did not give proper weight to the opinion of her treating psychiatrist, Dr. Dimitrova.  (Id.).  Third, the plaintiff contends that the ALJ

26

did not appropriately evaluate the plaintiff's allegations of her
own pain.  (R. at 20).  The Court agrees with the plaintiff's
first argument and remands the case.


**1.  The ALJ committed error in failing to discuss Dr. Arzadon's
treater report and in lack of explanation for his conclusion that
plaintiff could walk for two hours.**

As set forth in the earlier recitation of the medical
evidence, Dr. Barrish limited the plaintiff to one hour or less
of walking or standing.  Also, one of plaintiff's treaters, Dr.
Arzadon of Atlantic Health Center, completed a Department of
Social Services Report Form (R. 298), finding, inter alia,
standing and bending limited to two hours, and no walking,
climbing, carrying, squatting, or climbing in an 8 hour work day.
(Id.)  Further, he noted mild difficulties in maintaining social
functioning, frequent difficulties in maintaining concentration,
persistence or pace and has continual, repeated episodes of
decompensation, each of extended duration.  Id.  The ALJ does not
discuss this treater report, which, of course, is in line with –
indeed more restrictive than – Dr. Barrish's opinion on her
walking capability.  This failure alone commands a remand.  While
the ALJ is not required to analyze every piece of evidence in his
written decision, a failure to mention "important material
evidence" is sufficient for a court to "assume that the evidence
was not considered and [to] remand the case for the ALJ to

consider the record." Boston v. Barnhart, 332 F. Supp. 2d 879,
890 (D. Md. 2004), (citing Likes v. Callahan, 112 F.3d 189, 191
(5th Cir. 1997); Jones v. Chater, 65 F.3d 102, 104 (8th Cir.
1995)). Also, there was a clear failure of explanation. See SSR
96-2p (1996 WL 374188). (An ALJ's decision "must be sufficiently
specific to make clear to any subsequent reviewers the weight
[given] to the treating source's medical opinion and the reasons
for that weight.") Additionally, the basis for the ALJ's
conclusion that with pain medication she could walk and stand for
two hours is not clear. The ALJ stated that in Dr. Barrish's
examination, it was noted plaintiff suffered "pain with active
and passive range of motion," (R. 19). However, it is not clear
that the walking and standing restrictions were solely to avoid
pain rather than some other or additional consequence, such as
physical damage to the foot or falling due to weakness.
Accordingly, the Commissioner's decision is vacated and the ALJ
should consider and discuss all the evidence, including
specifically that of Dr. Arzadon, in his decision.

**2.    The ALJ committed no error in giving controlling weight to a
non-treating psychologist instead of the plaintiff's treating
psychiatrist, but should consider Dr. Arzadon's report on remand.**

The plaintiff contends that the ALJ's decision to give
greater weight to Dr. Caroline Moore's assessment of the
plaintiff than to her treating physician's assessment constitutes
reversible error. The plaintiff argues that Dr. Moore's

assessment is completely contradictory to the assessment made by Dr. Dimitrova.  The ALJ found that Dr. Dimitrova's records as a whole were inconsistent with the opinion she submitted to the Court in June 2007.

The opinions of a treating physician generally warrant special consideration since they reflect expert judgment based on continuing observation over a long period of time.  These opinions may be disregarded only if there is persuasive contradictory evidence.  Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987); Mitchell v. Schweiker, 699 F.2d 185, 187 (4th Cir. 1983).  Conversely, the opinions of a non-examining physician or health professional can be relied on when they are consistent with the record.  Moreover, "if the medical expert testimony from examining or treating physicians goes both ways, an ALJ's determination coming down on the side on which the non-examining, non-treating physician finds himself should stand."  Gordon v. Schweiker, 725 F.2d 231, 235 (4th Cir. 1984).  When deciding how much weight to give Dr. Dimitrova's opinion, the determination must be made according to the Treating Source Rule.  20 C.F.R. § 404.1527(d)(2) (2009).  The adjudicator is required to undertake a four step analysis.  In step one, the ALJ must determine whether or not the opinion came from a treating source as defined in 20 C.F.R. § 404.1502 and § 416.902.  In the present case, it is clear that Dr. Dimitrova was a treating source.  In step two, the opinion must be a medical opinion, which is defined as

opinions regarding the nature and severity of an individual's impairments.  The notes and Mental Residual Functional Capacity assessments submitted by Dr. Dimitrova seemingly satisfy this requirement.  The third requirement is that the adjudicator must find that the treating source's medical opinions are supported by medically acceptable clinical and laboratory diagnosis techniques.  The ALJ noted that this was supported by the records of Dr. Dimitrova. (R. at 20.)

This analysis hinges on the fourth and last step.  Under the final step, treating source opinions are entitled to controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the case record." 20 C.F.R. § 404.1527(d)(2) (2009)(emphasis added); see also Craig v. Chater, 76 F.3d 585, 590 (4th Cir. 1996).  "The more consistent an opinion is with the record as a whole, the more weight we will give that opinion."  20 C.F.R. §§ 404.1527(d)(4), 404.927(d)(4) (2009).  Therefore, if the opinions of treating physicians are supported by medically acceptable techniques, and not inconsistent with other substantial evidence in the record, they are given great weight.  See Smith v. Schweiker, 795 F.2d 343, 345-346 (4th Cir. 1986)("While the Secretary is not bound by the opinion of a claimant's treating physician, that opinion is entitled to great weight for it reflects an expert judgment based

on continuing observation of the patient's condition over a
prolonged period of time.").

On the other hand, the opinions of treating physicians do
not automatically control.  If a physician's opinion is
inconsistent with the record or other evidence, it can be
rejected.[14] See Craig, 76 F.3d at 590 ("Circuit precedent does
not require that a treating physician's testimony be given
controlling weight.  In fact, 20 C.F.R. §§ 404.1527(d)(2) &
416.927(d)(2) both provide, '[i]f we find that a treating
source's opinion on the issues of the nature and severity of the
impairments is well supported by medically acceptable clinical
and laboratory diagnostic techniques and is not inconsistent with
the other substantial evidence in the case record, we will give
it controlling weight.'")(internal citations omitted); Brewer v.
Astrue, 2008 WL 4682185*3 (E.D.N.C. Oct 21, 2008)("While an ALJ
may not reject medical evidence for no reason or for the wrong
reason, an ALJ may, under the regulations, assign no or little

---

[14]If a treating physician's opinions are inconsistent with
the record as a whole, the ALJ has the discretion to give the
treating physician's opinion less weight than other evidence.
Even if the ALJ finds that there is persuasive evidence contrary
to the treater's opinion, the ALJ must still, when assigning
weight to the treater's opinion, consider all of the following
factors:  (1) the length of the treatment; (2) the nature and
extent of the treatment relationship; (3) the evidence that
supports the opinion; (4) the consistency of the opinion with the
record; (5) the physician's specialty; and (6) any other relevant
factors.  20 C.F.R. § 404.1527(d)(2-6) (2009); see also Winford
v. Chater, 917 F.Supp 398, 401 (E.D. Va. 1996); Budzko v.
Barnhart, Civil No. SKG-04-275, slip op. at 24-26 (D. Md. Dec.
12, 2004).

weight to a medical opinion, even one from a treating source, based on factors set forth at 20 C.F.R. §§ 404.1527(d), 416.927(d), if he sufficiently explains his rationale and if the record supports his findings.")(internal citations omitted); Schweiker, 795 F.2d at 345-346 (Where the opinions of treating physicians conflict, or where a treating physician's opinion is not supported by sound evidence or medical technique, the opinion of a non-examining or not treating physician may constitute substantial evidence.).  Additionally, the better an explanation a doctor provides for his opinion, the more weight that opinion will be given. 20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3) (2009). In Craig, the court declined to give the treating source opinion significant weight in light of the fact that the opinion was not in line with the physician's own office notes.  76 F.3d at 589.

Here, as in Craig, the ALJ decided not to give Dr. Dimitrova's "extreme limitations" opinion controlling weight because it was unsupported by the doctor's own records, which showed the plaintiff's improvement and success with prescribed medication.  In stark contrast to the "extreme limitations" notation in Dr. Dimitrova's Mental Residual Functional Capacity ("RFC") Questionnaire of June 4, 2007, the last psychiatric note of Dr. Dimitrova's dated March 14, 2007 states that the plaintiff is minimally anxious, has no racing thoughts, has no distractibility, and is minimally impulsive.  (R. at 324).  The ALJ noted that the plaintiff noted improvement with regard to her

sleep problems once she was prescribed Trazadone.  Dr.
Dimitrova's own records indicate the plaintiff's continued
motivation and good social skills.  The limitations on
comprehension and attention span noted in Dr. Dimitrova's records
support the restriction promulgated by the ALJ to simple routine
tasks.  Id.

The ALJ gave greater weight to the opinion of a non-treating
psychologist, Dr. Caroline Moore.  Her opinion was afforded
significant weight because it is consistent with the record and
the claimant's demonstrated level of function.  (R. at 17).  Dr.
Moore assessed the claimant's impairments under listings 12.02
(organic mental disorders), 12.04 (affective disorders), and
12.09 (substance use disorder).  Id.  In Dr. Moore's opinion, the
plaintiff's impairments were no more than a mild restriction in
daily activities and mild difficulty maintaining social function.
(R. at 315.) The plaintiff's own statements that she gets along
well with others and is responsible for her own daily activities
are consistent with Dr. Moore's opinion.  (R. at 65).  Dr. Moore
and the plaintiff both identify problems with concentration,
persistence, and pace.  (R. at 65, 313).  Dr. Moore further noted
that impulsiveness is a problem for the plaintiff, although with
medication it has improved.  (R. at 315).  The number of episodes
of decomposition identified by Dr. Moore was two, and the ALJ
noted that no episodes had occurred since September 2005.  (R. at
17).  As Dr. Moore's opinion was more consistent with the

33

statements given by the plaintiff and the record in its entirety, there is no error.  However, on remand the ALJ should consider and discuss Dr. Arzadon's assessment discussed earlier, as it found greater mental limitations than Dr. Moore (or the ALJ).

**3.   The ALJ committed no reversible error in his evaluation of plaintiff's complaints of pain.**

In making his decision as to the credibility of the individual's statements, the ALJ considered the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychiatrists and other persons about the symptoms and how they affect the individual, and any other evidence in the case record. When considering the plaintiff's symptoms, the ALJ followed the two part test articulated in Craig v. Chater.  76 F.3d 585, 594 (4th Cir. 1996).

The first step requires that the ALJ determine whether or not there is an objective medical condition that could be reasonably expected to cause the plaintiff's condition.  Id. at 595.  Based on the record, the ALJ determined that the plaintiff's medically determinable impairments could reasonably be expected to result in the symptoms alleged by the plaintiff. (R. at 19).  These symptoms were noted to include difficulty completing tasks, mood swings, and some difficulty following directions related to her bipolar disorder.  Id.  The plaintiff

34

also had problems standing on her feet for long periods of time, resulting from her foot injury.  (R. at 18).

At the second step, the ALJ should evaluate the intensity and persistence of the pain and the extent of the limitations on the plaintiff's ability to work.  Id. at 595.  When objective medical evidence does not substantiate the claims of the plaintiff at step two, the ALJ must make a finding as to the credibility of the statements after considering the entire case record.  (R. at 18).  The factors to be considered by the ALJ when making this determination can be found in 20 C.F.R. 416.929(c):

> Claimant's daily activities; location, duration,
> frequency, and intensity of claimant's pain or
> other symptoms; factors that precipitate and
> aggravate the symptoms; the type, dosage,
> effectiveness and side effects of any medications
> the claimant takes to relieve the pain or other
> symptoms; treatment, other than medication, the
> claimant receives or has received for relief of
> pain or other symptoms; any measures other than
> treatment the claimant uses or has used to relieve
> pain or other symptoms; and any other factors
> concerning the claimant's functional limitations
> and restrictions due to pain or other symptoms. 20
> C.F.R. 416.929(c) (2009).

In the second step of the Craig test, the ALJ found that the plaintiff's statements concerning the intensity, persistence and limiting effects of these symptoms not to be entirely credible. (R. at 19).  The ALJ relied on the plaintiff's description of her daily activities for this finding.  (R. 20).  The plaintiff described her day as consisting of getting up, getting dressed,

and going to her doctor appointments or Narcotics Anonymous and
Alcoholics Anonymous meetings.  (R. at 81).  She eliminated all
activities that require standing for long periods of time.  Id.
However, she noted that she is able to manage her own finances,
drive a car, shop for necessary items, attend church and visit
with family.  (R. at 85).  The record likewise portrays a similar
picture of functioning not as dire as the conclusory statements
on pain.  The plaintiff was candid about her impairments and
appeared alert and oriented to Dr. Barrish.  (R. at 325).  Her
psychiatric records show improvement with treatment and the
plaintiff's demeanor was generally improved.  (R. at 324-338).
While the plaintiff's description of her activities indicated
that she had made some accommodations to alleviate pain, the
activities she continued to participate in showed that her
capacity to handle her pain with treatment was much greater than
she had alleged.  (R. at 19).  From this evidence, the ALJ
determined that the variety, frequency, and range of the
plaintiff's activities was inconsistant with a level of pain
greater than that the ALJ found in the RFC.  (R. 20).

   The ALJ also mentioned the plaintiff's ability to function
without over-the-counter or prescription medications for pain.
(R. at 19).  Dr. Barrish's report mentions that the plaintiff
received cortisone injections but does not mention any
medications she was taking for pain.  (R. at 233-235).  This is
sugnificant because the Fourth Circuit has stated that "[i]f a

symptom can be reasonably controlled by medication or treatment, it is not disabling." <u>Gross v. Heckler</u>, 785 F.2d 1163, 1166 (4th Cir. 1986); <u>Purdham v. Celebrezze</u>, 349 F.2d 828, 830 (4th Cir. 1965).  The absence of the plaintiff's reliance on pain medication certainly factored into the ALJ's decision to deviate from Dr. Barrish's assessment of her capabilities.  The ALJ thus determined that an additional hour of standing would not be more than the plaintiff could bear.  (R. at 19).

**CONCLUSION**

For the above reasons, the Court **VACATES** the decision of the Commissioner and **REMANDS** the case.  Accordingly, it is hereby **ORDERED** that plaintiff's motion for summary judgment be **DENIED** and defendant's motion for summary judgment be **DENIED.**


Date: 7/10/09                         _____/s/_____
                                      Susan K. Gauvey
                                      United States Magistrate Judge